IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NATHANIEL L. JACKSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 10-919-SLR |
| | ) |
| PERRY PHELPS, et al., | ) |
| | ) |
| Defendants. | ) |

**REVISED MEMORANDUM WITH SEPARATE ORDER**

At Wilmington this 19th day of November, 2013, having reviewed the papers submitted in connection with the pending motions for summary judgment, the court issues its decision based on the following reasoning;

1. **Background.** The incident at issue started on March 18, 2010, when plaintiff Nathaniel L. Jackson was a pretrial detainee housed in the Secured Housing Unit ("SHU") at the James T. Vaughn Correctional Center ("VCC") in Smyrna, Delaware. On that day, the SHU was in lockdown. The inmates were given bagged lunches in their cells; when plaintiff attempted to flush his lunch bag down the toilet, the toilet flooded. In response to the toilet flooding, plaintiff was placed in handcuffs and escorted to another building[1] by defendants Vincent L. Lewis, Jr. and Keith T. Burns. Thereafter, defendant Michael Trader informed plaintiff that he was being placed in 24-hour restraints for flooding his cell. Although plaintiff tried to explain that he did not flood his

---

[1] Building 17.

cell on purpose, he was taken to a room where he was directed to kneel, face the wall, and remove all of his clothing except for his boxers. Defendants Trader, Lewis, Burns, and Brandon W. Richardson then placed plaintiff in 24-hour restraints, which included handcuffs secured to a waist chain, leg shackles, and a black box with a padlock that bound his wrists together.[2] Plaintiff was cooperative at this time.

2. In full restraints, plaintiff complained that his handcuffs were too tight. A nurse came in, checked the cuffs, and indicated that they were fine. Plaintiff continued to complain about the tight cuffs after the nurse left and, when no one responded, he tried to get someone's attention by alternating between kicking and shaking the door to the room. It is not altogether clear from the record why defendants determined to place a foam rubber helmet on plaintiff[3] but, when they attempted to do so, plaintiff refused to cooperate and was taken to the ground by several correctional officers, including defendants Miguel Figueroa, Steven R. Floyd, Sr., Jesse Martin, and Paul Gauthier. Plaintiff continued to struggle and resist the attempts to place the foam helmet on him. Although defendants' efforts ultimately were successful, plaintiff (still cuffed) later managed to nudge the helmet off and recommence banging on the door.

3. Defendants Lewis and Burns returned to plaintiff's location and instructed plaintiff to turn around, kneel down, and face the wall.[4] As soon as plaintiff complied

---

[2]This is the same equipment used to transport inmates to court.

[3]The parties dispute whether plaintiff was banging his head on the door and, therefore, the helmet was provided to protect him from injury.

[4]According to plaintiff, he did so because defendant Lewis asked if he was ready to leave.

2

with these instructions, defendants Lewis, Burns, Richardson, Figueroa, Floyd and Sean Endicott tackled plaintiff to the ground and pulled his boxers down so that a nurse could give him a shot[5] on each of his buttocks. According to plaintiff, defendants left him with his boxers down, and mocked him as a result. Plaintiff eventually fell asleep on a foam mattress that had been left in the room by defendants. The next morning, plaintiff could not eat breakfast and only managed to consume lunch by eating with just his mouth, like a dog.[6] When plaintiff's 24-hour restraint period expired,[7] defendant Richardson and another correctional officer removed plaintiff's restraints and escorted him back to SHU, barefoot and clothed only in his boxers. Plaintiff claims that the events that occurred during the 24-hour restraint period left him with imprints and welts on his wrists, scratches to his head, and mental and emotional distress.

**4. Standard of review.** "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter

---

[5]An injective sedative, although that apparently was not made clear to plaintiff at the time.

[6]Plaintiff's allegation against defendant Daum consisted of the following: "When lunch arrived, Plaintiff asked Daum how he was supposed to eat, to which Daum responded 'Well. No matter what, your cuffs [are] not coming off, so you need to get creative.'" (D.I. 113 at 5) The court finds that this is not sufficient to hold Daum liable under § 1983.

[7]Plaintiff was in 24-hour restraints from approximately 5:30 p.m. on March 18 to 5:30 p.m. on March 19, 2010.

3

the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

5. **Service.** Defendants Figueroa, Lewis and Ricardson argue in support of their motion for summary judgment that the court lacks personal jurisdiction over them because they were never served. In this regard, the record reflects that counsel for these defendants properly executed a waiver of service on behalf of each such defendant on March 8, 2012, and returned them to plaintiff's counsel. (D.I. 115, ex. P) There is no indication, however, that plaintiff's counsel ever filed with the court such

forms, as contemplated under Fed. R. Civ. P. 4(d)(4).[8] Said defendants have maintained their defense of improper service of process in their answers to plaintiff's various amended complaints. (See, e.g., D.I. 40, 90) Nevertheless, the form of waiver itself (AO Form 399) is less than clear about the effect of obtaining a waiver, stating that, "[i]f the waiver is signed and returned," a defendant "will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that [the defendant] waive[s] any objections to the absence of a summons or of service." (D.I. 115, ex. P) Under these circumstances, the court agrees with the analysis in *Weathers v. Lanier*, Civ. No. 4:05 C11 RLV, 2006 WL 3709560, at *2 (N.D. Ga. Nov. 6, 2006), that the "filing of [a Rule 4(d) waiver] is merely a ministerial act and that the failure to timely file that waiver does not operate to extinguish a cause of action." The court in *Weathers* relied in part on Rule 4(l)(3), which provides (consistent with Form AO 399) that ""[f]ailure to prove service does not affect the validity of service. The court may permit proof of service to be amended." Fed. R. Civ. P. 4(l). The court found further support in Rule 5(d), which provides that papers required to be served must thereafter with the court "within a reasonable time after service." Fed. R. Civ. P. 5(d)(1). Therefore, the court rejects the notion that it lacks personal jurisdiction over defendants based on the ministerial act of filing the waivers with the court, but will require plaintiff's counsel to file the waivers on or before **November 22, 2013.**

6. **Statute of Limitations.** Defendants Endicott, Gauthier and Martin argue in

---

[8]Rule 4(d)(4) provides that, "[w]hen the plaintiff files a waiver, proof of service is not required and these rules apply as if a summons and complaint had been served at the time of filing the waiver."

support of their motion for summary judgment that plaintiff failed to pursue his claims against them within the two-year statute of limitations. Plaintiff filed his initial, amended, second amended, and third amended complaints on October 27, 2010, January 19, 2012, March 19, 2012, and December 14, 2012, respectively. (D.I. 2, 28, 44, 77) These moving defendants were added in the third amended complaint.

7. Cases arising under 42 U.S.C. § 1983 are held to Delaware's two-year statute of limitations for personal injury, 10 Del. C. § 8119. See McDowell v. Delaware State Police, 88 F.3d 188, 191 (3d Cir. 1996). Such claims accrue "as soon as a potential claimant either is aware, or should be aware, of the existence of and source of an injury." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1386 (3d Cir. 1994). There is a limited exception to the two-year statute of limitations - the federal equitable tolling doctrine. Equitable tolling "can [only] be applied to suits brought under federal civil rights statutes when the state statue of limitations would otherwise frustrate federal policy." Lake v. Arnold, 232 F.3d 360, 370 (3d Cir. 2000). To invoke the doctrine of equitable tolling, a plaintiff must demonstrate that: (a) a defendant actively misled a plaintiff with respect to his cause of action; (b) the plaintiff has been prevented from asserting his claim as a result of other extraordinary circumstances; or (c) the plaintiff asserts his claims in a timely manner but has done so in the wrong forum. See Moody v. Kearney, 380 F. Supp. 2d 393, 397 (D. Del. 2005).

8. Plaintiff argues that the doctrine of equitable tolling should be applied to the facts of this case, where plaintiff was unaware of the defendants' involvement in the March 2010 incident until the production of defendant Trader's investigative report on

6

July 5, 2012 and the deposition testimony of defendant Richardson on July 6, 2012. Plaintiff included such defendants in his third amended complaint, which was filed with the court on July 30, 2012, along with plaintiff's motion for permission to file such.[9] Under these circumstances, the court finds that the doctrine of equitable tolling applies and plaintiff's claims against these defendants are not barred by the statute of limitations.

9. Nevertheless, the court must address the question of whether plaintiff's third amended complaint relates back to the date that plaintiff's original complaint was filed and, therefore, does not fall outside the statute of limitations. Rule 15(c)(1) of the Federal Rules of Civil Procedure imposes three conditions for relation back: (a) the amendment asserts a claim that arose out of the conduct, transaction, or occurrence set out in the initial pleading; (b) the newly named party received such notice of the institution of the action within the period specified in Rule 4(m) (i.e., 120 days), so that the party will not be prejudiced in maintaining a defense on the merits; and (c) the newly named party knew or should have known that the action would have been brought against him, but for a mistake (or lack of knowledge) concerning the newly named party's identity. See *Johnson v. GEICO Cas. Co.*, 673 F. Supp. 2d 244, 248-49 (D. Del. 2009).

10. All three of these conditions are met with respect to defendants Endicott and Gauthier, as the claims against them arise out of the same event that served as a basis for plaintiff's initial complaint, and these defendants had imputed notice of both the

---

[9]The motion was granted on December 14, 2012.

lawsuit and their involvement in it through defendant Trader's investigation. (D.I. 115, ex. F) Plaintiff's claims against defendant Martin fall outside the statute of limitations, however, as he was not implicated in the official investigation and had no other notice of the lawsuit before being sued.

11. **Exhaustion**. Congress enacted the Prison Litigation Reform Act ("PLRA") in an effort to curb the number of prisoner filings in the federal courts. *Small v. Camden County*, 728 F.3d 265, 268 (3d Cir. 2013). The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003). Failure to exhaust is an affirmative defense that the defendant must plead and prove. *Jones v. Bock*, 549 U.S. 199, 212 (2007). Moreover, the defendant must demonstrate that the prisoner failed to exhaust each of his claims. *Id.* at 220-24.

12. Exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge, even if that determination requires the resolution of disputed facts. *Small*, 728 F.3d at 269-271. In so doing, the court must first determine whether administrative remedies were available to plaintiff. "[A]vailability may sometimes turn on questions of fact," and "'available' means 'capable of use, at hand.'" *Smith,* 728 F. 3d at 271 (citations omitted).

13. Next, the court must consider whether the inmate completed the "administrative review process in accordance with the applicable procedural rules" that

8

are "defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218. The Third Circuit has held that "to complete the administrative review process" means "substantial" compliance with the prison's grievance procedure. *Spruill v. Gillis*, 372 F.3d 218, 231-32 (3d Cir. 2004) (citing *Nyhuis v. Reno*, 204 F.3d 65, 77-78 (3d Cir. 2000)). Prison grievance procedures establish the yardstick for determining what steps are required for exhaustion. *See Spruill*, 372 F.3d at 231; *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007).

14. There is no futility exception to the PLRA's mandatory exhaustion requirement. *Nyhuis*, 204 F.3d at 71. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

15. An inmate will not be held to strict compliance with this exhaustion requirement, however, if the actions of prison officials directly caused or contributed to the inmate's procedural default on a grievance. *Camp v. Brennan*, 219 F.3d 279 (3d Cir. 2000); *Mack v. Curran*, 457 Fed. Appx. 141, 145 (3d Cir. 2012) (unpublished) ("We have recognized certain circumstances prevent the timely pursuit of the prison grievances process, thereby making the administrative remedies 'unavailable'."); *Brown v. Croak*, 312 F.3d 109, 112 (3d Cir. 2002) (administrative remedies unavailable where prison officials gave inmate erroneous instructions about grievance process). Prison officials "may waive the exhaustion requirement if the ultimate administrative authority fully examines the inmate's complaint on the merits, regardless of whether the

complaint complied with the prison grievance process." *McKinney v. Guthrie*, 309 Fed. Appx. 586, 588 (3d Cir. 2009) (unpublished).

16. Plaintiff filed a grievance related to the March 2010 incident on September 5, 2010. (D.I. 115, ex. K) Consistent with the court's understanding of the Department of Correction's grievance policies,[10] plaintiff's grievance was returned as "non-grievable," and plaintiff was instructed to write S/Lt. Willey "for security staff issues." (D.I. 115, ex. K) Defendants did not reject the grievance as untimely. Plaintiff thereafter wrote a letter about the incident to defendant Phelps, the Warden of VCC at the time, who apparently authorized an investigation into the incident. (*Id.*, exs. F, M) Under these circumstances, the court finds that plaintiff has exhausted the available administrative remedies. *See Bredbenner v. Malloy*, 925 F. Supp. 2d 649, 658-59 (D. Del. 2013).

17. **Excessive force claim.** Plaintiff, as a pretrial detainee at the time of the March 2010 incident, had federally protected liberty interests, to wit: "[U]nder the Due Process Clause a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Still, as explained by the United States Court of Appeals for the Third Circuit,

> "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense . . . ." For example, conditions that are reasonably related to a penal institution's interest in main-taining jail security typically pass constitutional muster. . . . Under *Bell*, a "particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility

---

[10]See *Abraham v. Costello,* Civ. No. 07-593-SLR, 2013 WL 5954487, at *3 (D. Del. Nov. 6, 2013), where the court found that "complaints about staff issues, including excessive force, were considered non-grievable.".

> officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose." . . . "In evaluating a pretrial detainee's claim of unconstitutional punishment, courts must examine the totality of the circumstances within the institution."

*Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (citations omitted). The *Bell* due process standard concerning conditions of confinement are not applicable, however, to a pretrial detainee's excessive force claims arising in the context of a prison disturbance. Instead, the Third Circuit has applied the "more demanding 'Eighth Amendment cruel and unusual punishments standards found in [*Whitley v. Albers,* 475 U.S. 312 (1986) and *Hudson v. McMillian*, 503 U.S. 1 (1992). . . ." *Bistrian*, 696 F.3d at 374. As explained in *Fuentes v. Wagner*, 206 F.3d 335 (3d Cir. 2000),

> when a court is called upon to examine the amount of force used on a pretrial detainee for the purpose of institutional security, the appropriate analysis is . . . whether the measure taken inflicted unnecessary and wanton pain and suffering [which] depends on 'whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm.'

*Id.* at 347. In further explanation, the Third Circuit suggested that "prison guards [cannot] be expected to draw such precise distinctions between classes of inmates[11] when those guards are trying to stop a prison disturbance." *Id.* at 347-48.

18. The court accepts defendants' argument that the events of March 18, 2010 started out "in the context of a prison disturbance" and that the amount of force initially used on plaintiff was appropriate for the purpose of institutional security. The real dispute, however, is what transpired **after** plaintiff was moved out of SHU to Building

---

[11]Pretrial detainees, convicted but unsentenced inmates, and sentenced inmates.

11

17, at a time and in a place where (as far as the court can discern) there were no particular security concerns and certainly no contemporary prison disturbance. In this regard, the court concludes that the proper standard of review is that for conditions of confinement under *Bell,* that is, whether (under the totality of the circumstances within the institution) the conditions surrounding plaintiff's 24-hour restraint were punitive in the constitutional sense, or whether they were instead rationally related to a legitimate non-punitive government purpose. There are genuine issues of material fact related to this question, as plaintiff's description of the events is different from that of defendants, with the official documents offering yet again other versions of the facts. (*See, e.g.,* D.I. 115, exs. F, I)

19. **Supervisory liability.** To establish supervisory liability under § 1983, a plaintiff "must identify a specific supervisory practice or procedure that defendant failed to employ, that the existing custom or practice without that specific practice or procedure created an unreasonable risk of harm, that defendant was aware that this unreasonable risk existed, that defendant was indifferent to the risk, and that plaintiff's harm resulted from defendant's failure to employ that supervisory practice or procedure." *Collins v. Kearney,* 495 F. Supp. 2d 466, 472 (D. Del. 2007).

20. The record is consistent with plaintiff's argument that placing inmates in 24-hour restraints without a hearing was a practice at JVV of which defendants Perry Phelps and Trader were aware, yet they failed to ensure that the appropriate due process mechanisms were in place to prevent pretrial detainees from being restricted

absent a legitimate, governmental objective.[12] The entry of summary judgment is not appropriate under these circumstances.

21. **State law claims.** The tort of assault and battery is defined in Delaware as "the intentional, unpermitted contact upon the person of another which is harmful or offensive." *Brzoska v. Olson,* 668 A.2d 1355, 1360 (Del. 1995) (citations omitted). Plaintiff must prove an intent to make contact, not an intent to cause harm, and the contact "must offend a reasonable sense of personal dignity." *Id.* at 1360-61. Assuming for purposes of this motion practice that the contact at issue was intentional and unpermitted,[13] there are genuine issues of material fact with respect to defendants' conduct during the period of time in question. Looking at the facts in a light most favorable to plaintiff, the alleged contact can certainly be characterized as both harmful and offensive.

22. With respect to plaintiff's claim for intentional infliction of emotional distress, the record supports the proposition that there are at least genuine issues of material fact regarding whether plaintiff suffered some physical injury upon which a claim for emotional distress can be based, given that on two occasions, multiple correctional officers forcibly restrained him.

23. **Qualified immunity.** State officials performing discretionary duties are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

---

[12]*See, e.g.,* D.I. 115, ex. H at 58; ex. L at 30-31; ex. N at 26-27; ex. O at 29.

[13]Based on the court's analysis of plaintiff's excessive force claim.

would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). For a federal right to be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The court concludes that defendants have not established a basis for qualified immunity on the record at bar. In the first instance, the court has found that plaintiff can demonstrate that defendants' actions were violative of a federal constitutional or statutory right. Given plaintiff's undisputed status as a pretrial detainee and the separation (both in time and location) of the initial restraint and the imposition of the 24-hour restraints, plaintiff's constitutional rights were "clearly established."

_____
United States District Judge